# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Melinda Ladd,

      Plaintiff,

v.

Mohawk Carpet Distribution, L.P.,

      Defendant.

_____

Civil No. 08-6470 (JNE/JJG)


**REPORT
AND
RECOMMENDATION**


JEANNE J. GRAHAM, United States Magistrate Judge

This matter came before the undersigned on January 26, 2010 on a motion, by defendant Mohawk Carpet Distribution, for summary judgment (Doc. No. 22).  Plaintiff Melinda Ladd was represented by Harvey B. Friedenson, Esq.  Mohawk was represented by Timothy R. Newton, Esq., and Christianna L. Finnern, Esq.  The motion is referred for a report and recommendation in accordance with 28 U.S.C. § 636(b) and Local Rule 72.1(b).

After Ms. Ladd (Ladd) was offered a job at Mohawk, she briefly worked there but was ultimately denied employment.  She then commenced this litigation, variously asserting sex and disability claims under the Rehabilitation Act, Title VII of the Civil Rights Act, the Americans with Disabilities Act (the ADA), and the Minnesota Human Rights Act (the MHRA).  She also presents claims for defamation, promissory estoppel, and breach of contract, as well as certain wage law violations.  With the exception of the wage law violations, Mohawk moves for summary judgment.  This Court recommends that the motion be granted.

## I.    BACKGROUND

In April 2007, Melinda Ladd was working for HomeValu, a home-improvement business. She was not actively seeking new employment, but she had concerns about the opportunities for advancement in her current job.  (Exh. 1 at 45-46.)[1]

Around this time, Brady Brower, Ladd's friend and former colleague, left his position as a salesperson at Mohawk, which manufactures and sells flooring products.  Brower suggested to Tim Dawald, a Mohawk district manager, that Ladd would be a good replacement.  Dawald did not want to jeopardize Mohawk's relationship with HomeValu by contacting Ladd himself, so he asked Brower to tell Ladd that she should contact Dawald about the position.  (Exh. 1 at 43.)

Ladd and Dawald talked in late April or early May 2007, and according to Dawald, their discussion culminated in a formal interview in late July 2007.  (Exh. 1 at 58; Exh. 2 at 2.)  At least one of these meetings was attended by Jeff Johnson, a regional sales manager for Mohawk. (Exh. 1 at 71-72; Exh. 2 at 2.)  According to Ladd, Johnson described the sales position in this way:

> [Johnson] had his own concerns as far as the market was slow.  He said that it would take about two years for me to actually start being productive [as a salesperson] . . . .  That was his main concern, that it would take at least two years for me to develop and get numbers rolling and things like that.  And he wanted to make sure . . . that I had the heart to stick with it for two years with low numbers and things like that.  I assured him that . . . if he was up front and he knew that's the way things would go that I could stick through it.

(Exh. 1 at 74.)  Ladd further contends that Johnson asked her, "Can you hack it for two years until you get going?"  (Exh. 1 at 175.)

---

[1]    Exhibits are cited in an appendix at the end of this report and recommendation.

Ladd completed an online application for the Mohawk sales position on May 28, 2007. (Exh. 1 at 58; Exh. 3.) The application stated, "[A]ny false or misleading information given in my application or interview(s) may be cause for immediate dismissal without further notice[.]" It further indicated that employment with Mohawk would be at-will. (Exh. 3.)

Among other questions, the application asked Ladd if she had a "State Issued Photo ID." Due to a 2006 conviction for drunk driving, Ladd was on probation and did not have a valid driver's license, but she did have a state-issued photo identification card. For this reason, Ladd contends, she answered this question in the affirmative. (Exh. 1 at 65; Exh. 3.)

The application also requested the expiration date for her driver's license. Ladd entered September 6, 2009, implying that she had a valid driver's license at the time. Ladd claims that this was a typographical error, and she had meant to enter September 6, 2006, the date that her driver's license had expired. (Exh. 1 at 66; Exh. 3.)

According to Ladd, she received a call from Dawald on August 8, 2007. He offered her the job, on the condition that she receive a good recommendation and a blessing from her current boss at HomeValu. Dawald then contacted her boss, who did not object. One or two days later, Dawald called Ladd back and told her, "Welcome to the family." (Exh. 1 at 80-84.)

Ladd received an offer letter and a background check authorization form from Mohawk's human resources department on August 22, 2007. (Exh. 1 at 69.) The letter provided that her employment with Mohawk was "at-will." (Exh. 4.)

Ladd contends that she filled out the background check authorization form and attempted to fax it back to Mohawk on August 23, 2007. (Exh. 1 at 96.) Mohawk evidently did not receive the form, prompting human resources to call Ladd on August 28, 2007. According to Ladd, she resent the form on August 29, 2007. (Exh. 1 at 95-96; Exh. 5 at 3.)

Curiously, Ladd applied to have her driver's license reinstated on August 27, 2007, two days before she successfully sent her background check authorization form to Mohawk. Ladd anticipated that her license would be reinstated within two days. (Exh. 1 at 97.)

On September 4, 2007, Ladd appeared for her first day of work at Mohawk. (Exh. 1 at 118-20.) Mohawk received Ladd's background check on September 5, 2007. It stated that, as of August 29, 2007, she did not have a valid driver's license. It also reported two drunk-driving convictions, including her most recent one from 2006, and that she remained on probation for that offense until 2010. (Exh. 5 at 3; Exh. 6 at 3-6.)

The job description for the Mohawk sales position does not expressly mention driving, but it does require the "[a]bility to actively travel [the] sales area." (Exh. 7.) Mohawk further contends that a salesperson's vehicle is a mobile office, with the salesperson bringing samples and pamphlets to potential buyers. (Exh. 2 at 1-2.) For these reasons, officials at Mohawk were concerned about Ladd's driving record.

A human resources manager at Mohawk, Juanita Drew, recommended that Mohawk not hire Ladd. Drew observed that Ladd had a history of drunk-driving offenses; she remained on probation for one of those offenses; and she evidently did not have a valid driver's license. Drew found that this reflected a history of bad driving decisions, and as a result, that Ladd posed an undue risk of liability for Mohawk. (Exh. 5 at 3-4.)

Based on this determination, Mohawk human resources informed Dawald that he could not hire Ladd. Dawald called Ladd, before she came in to work, early on September 6, 2007. He told her that she was not being hired for her lack of a valid driver's license. Ladd countered that she did have a valid driver's license. Dawald replied that she should come in the next day and be prepared to present proof of her license. (Exh. 1 at 123-25.)

At the ensuing meeting on September 7, 2007, Ladd and Dawald were joined by Tim Simmons, a senior sales manager at Mohawk. (Exh. 2 at 3.) Ladd offered her driver's license, which Dawald faxed to human resources. Simmons further informed Ladd there were concerns regarding her background check, although neither Dawald nor Simmons claimed to know the nature of those concerns. (Exh. 1 at 125-26.)

Ladd then disclosed her drunk-driving offenses, as well as the fact that she had completed treatment for alcoholism after her most recent conviction. She stated that she was rehabilitated and that her problems with alcohol were behind her. Simmons told Ladd that he and Dawald would "go to bat for her," and that her history would not prevent her from working for Mohawk. (Exh. 1 at 127-30.)

Drew subsequently discussed Ladd with David Westerfield, a senior director of human resources at Mohawk. (Exh. 8 at 4.) At this point, it appears that Mohawk human resources had verified the reinstatement of Ladd's driver's license. Westerfield nevertheless decided that Ladd should not be hired, identifying several issues.

Like Drew, Westerfield observed that Ladd had two drunk-driving offenses and remained on probation, and so he was concerned about whether Ladd was appropriate for a position that required significant driving. Westerfield also determined that Ladd misrepresented the status of her driver's license on the job application, and in order to conceal this problem, that Ladd delayed completion of the background check form. Moreover, Westerfield found, Ladd did not disclose any problems with her driver's license until she was confronted by Mohawk management. (Exh. 9 at 3-4.)

On September 11, 2007, Dawald informed Ladd that she would not be hired for the sales position. (Exh. 1 at 136.) Ladd then called Drew, and according to Ladd, Drew said she was

being denied the job because of her drunk-driving offenses.  (Exh. 1 at 152.)  Ladd contends that

she offered to take certain measures in order to overcome Mohawk's concerns, like attaching a

breathalyzer to her car, but Mohawk apparently declined this offer.  (Exh. 1 at 145.)

After she was denied employment at Mohawk, Ladd applied for various jobs with other

companies.  In these interviews, potential employers asked her to explain the gap in her resume.

Ladd told these employers that Mohawk discriminated against her because of her alcoholism, or

that Mohawk had decided to eliminate the position.  (Exh. 1 at 162-64.)

In support of her claims of discrimination, Ladd contends that she was similarly situated

to Brower.  According to Ladd, Brower also had two prior drunk-driving convictions.  (Exh. 1 at

128, 139-40.)  At the time Brower was hired, however, Mohawk did not conduct background

checks on prospective employees, nor has it ever performed checks for current employees.  (Exh.

5 at 3, 5-6.)  Dawald evidently was aware that Brower had one prior drunk-driving offense, but

Dawald did not know when it occurred and did not report it to Mohawk human resources.  (Exh.

2 at 4; Exh. 5 at 5-6; Exh. 9 at 4.)

## II.  DISCUSSION

### A.  Standard of Review

#### 1.  General Principles

To obtain a summary judgment pursuant to Rule 56(c), the moving party must show there

are no issues of material fact and it is entitled to a judgment as a matter of law.  *DG&G, Inc. v.

Flexsol Packaging Corp.*, 576 F.3d 820, 823 (8th Cir. 2009).  An issue of material fact is present

where there is sufficient evidence for a reasonable juror to return a verdict for the nonmoving

party.  *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1029 (8th Cir. 2006).  This

standard requires the record to be considered with all reasonable inferences for the nonmoving party. *Country Life Ins. Co. v. Marks*, 592 F.3d 896, 898 (8th Cir. 2010).

Through two different arguments, Mohawk challenges the evidence that Ladd presents in support of her claims. In her opposition to summary judgment, Ladd has offered an affidavit that purportedly contradicts statements she made in her deposition. As a result, Mohawk argues, it is a "sham affidavit" that should not be considered on summary judgment. Mohawk further argues that, to the extent Ladd makes claims about the knowledge of various persons at Mohawk, those claims are not founded on personal knowledge, in violation of Rule 56(e).

### 2. Sham Affidavit

Where a party testifies to certain facts during a deposition, and that party later executes an affidavit that directly contradicts the previous testimony, a court has authority to disregard the affidavit. The affidavit is deemed a sham and, in the context of a motion for summary judgment, it cannot be used to create an issue of material fact. *See, e.g., Popoalii v. Correctional Medical Servs.*, 512 F.3d 488, 498 (8th Cir. 2008).

Although courts have the authority to disregard a sham affidavit, this authority should be exercised "with extreme care." *Baker v. Silver Oak Senior Living Mgmt. Co.*, 581 F.3d 684, 690 (8th Cir. 2009). Thus when deciding whether an affidavit contradicts prior testimony, the court must take reasonable inferences for the nonmoving party, considering whether a reasonable juror would find the affidavit contradictory. *Id.* at 691.

If the ensuing affidavit is not directly contradictory, or if it only restates or clarifies prior testimony, then it is properly part of the record on summary judgment. *Baker*, 581 F.3d at 690; *Popoalii*, 512 F.3d at 498. But where a witness expresses no confusion or uncertainty during a deposition, yet makes unanticipated reversals in a subsequent affidavit, that affidavit is properly

deemed a sham and should not be considered.  *City of St. Joseph v. Southwestern Bell Telephone*, 439 F.3d 468, 476 (8th Cir. 2006) (quotation omitted); *Bass v. City of Sioux Falls*, 232 F.3d 615, 618 (8th Cir. 1999) (quotation omitted).

Of those issues of material fact presented by the current motion, Ladd makes two factual claims, in an affidavit against summary judgment, that are inconsistent with her prior deposition testimony.  In the context of her claim for breach of contract, Ladd claims that she was promised employment for a two-year term.  In the context of her defamation claim, Ladd claims that she told prospective employers that Mohawk did not hire her because of her drunk-driving offenses.

During her deposition, when discussing the contract claim, Ladd did not testify that she was promised an employment contract for any particular term.  At best, her deposition testimony shows that Johnson expected Ladd to fall short of sales expectations in her first two years of employment.  Yet in the affidavit, Ladd contends that both Dawald and Johnson promised her a two-year term of employment.  (Exh. 10 at 4-6.)

In her deposition testimony regarding her defamation claim, Ladd testified at some length about what she told prospective employers.  She said that, when those employers asked about her time at Mohawk, she told them she was discriminated against because of her alcoholism, or that Mohawk had eliminated the position.  But in her ensuing affidavit, Ladd contends that she told a prospective employer she was not hired for failure to disclose her drunk-driving offenses.  (Exh. 10 at 8.)

Ladd did not express confusion or uncertainty during her deposition.  She was allowed to fully explain what she was promised by Mohawk and what she later told prospective employers. Yet in her affidavit, Ladd makes claims that cannot be reasonably reconciled with her deposition

testimony. These claims are not appropriately considered for the purposes of summary judgment here.

This Court further observes that, as a more general principle, reasonable inferences also do not require a court to accept the self-serving allegations of a nonmoving party. To establish an issue of material fact, the nonmoving party instead must cite relevant evidence as will permit a verdict in its favor. *See, e.g., Smith v. Int'l Paper Co.*, 523 F.3d 845, 848 (8th Cir. 2008) (quotation omitted). So unsubstantiated statements from Ladd, whether contradictory or not, will not be enough to avoid summary judgment.

### 3. Personal Knowledge

Turning to Rule 56(e), it requires that in summary judgment practice, an affidavit "must be made on personal knowledge," among other requirements. As a result, an employee usually cannot claim personal knowledge of discriminatory animus by that person's employer, without some proof the employee had been made personally aware of the employer's intentions. *See El Deeb v. University of Minnesota*, 60 F.3d 423, 428-29 (8th Cir. 1995) (rejecting an employee's claims of discriminatory animus where the claims only reflected the employee's personal views); *Love v. Commerce Bank of St. Louis, N.A.*, 37 F.3d 1295, 1296 (8th Cir. 1994) (disregarding an employee's claims of discrimination where there was no indication that the employee could have acquired personal knowledge of a discriminatory incident).

As Mohawk has indicated, Ladd sometimes claims to have personal knowledge about the intent or motives of Mohawk or its employees, without there being any reasonable indication of how she could have acquired that knowledge. This Court concludes, in accordance with Rule 56(e), that such allegations are not properly considered in a motion for summary judgment either.

## B. Disability Discrimination

### 1. Introduction

For her disability discrimination claims, Ladd advances causes of action pursuant to the Rehabilitation Act, the Americans with Disabilities Act (the ADA), and the Minnesota Human Rights Act (the MHRA). For the Rehabilitation Act claim, Mohawk contends that Ladd has no private cause of action. Because Ladd has not opposed this argument, she concedes this claim on summary judgment. *See, e.g., Satcher v. University of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 734-35 (8th Cir. 2009).

This Court accordingly focuses on the remaining claims under the ADA and the MHRA. As disability discrimination claims under these laws are substantially identical, they generally do not require separate analysis here. *See, e.g., Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 & n.4 (8th Cir. 2007).

The ADA provides that an employer cannot discriminate against a "qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a) (2006); *see also* Minn. Stat. § 363A.08, subd. 2. If there is no direct evidence of discrimination, a plaintiff must inferentially establish discrimination in accordance with the burden-shifting framework set forth by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

This framework requires the employee to present prima facie evidence that the plaintiff (1) is disabled within the meaning of the ADA; (2) is qualified to perform the essential functions of the job; and (3) suffered an adverse employment action under circumstances that permit an inference of unlawful discrimination. Once the employee establishes every element of the prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. The burden then shifts back to the employee to show that this

reason was a pretext for unlawful discrimination. *Willnerd v. First Nat'l Nebraska, Inc.*, 558 F.3d 770, 777-78 (8th Cir. 2009).

Because much of the evidence in an employment discrimination case turns on inferences rather than direct evidence, courts are expected to be more deferential to the nonmoving party on a motion for summary judgment. But even with regard for this deference, if the employee does not provide sufficient evidence to establish an essential element of the case, summary judgment remains proper. *Equal Employment Opportunity Comm'n v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001).

Although the parties dispute various elements of the disability discrimination claims here, the dispositive question here is whether Ladd falls within the definition of disability. The ADA provides in relevant part,

> The term "disability" means, with respect to an individual—
>
> (A)    a physical or mental impairment that substantially limits one or more major life activities of such an individual;
>
> (B)    a record of such an impairment; or
>
> (C)    being regarded as having such an impairment.

42 U.S.C. § 12102(2) (2006). Ladd contends that, under paragraph (A), her alcoholism substantially limits certain major life activities; or alternatively, under paragraph (C), that Mohawk regarded her as an alcoholic.

### 2.    Substantial Limits on Major Life Activity

To decide whether an impairment substantially limits a major life activity, a court must undertake an analysis of how that impairment affects that particular activity. *Didier v. Schwan Food Co.*, 465 F.3d 838, 841-42 (8th Cir. 2006). So the fact that an employee is diagnosed with

an impairment, by itself, is not enough to demonstrate substantial limitations. *Samuels v. Kansas City Missouri Sch. Dist.*, 437 F.3d 797, 801 (8th Cir. 2006).

A limit is substantial where an employee cannot perform a task that an average person can, or where an employee is significantly restricted in the condition, manner, or duration of how the task is performed compared to members of the general population. To determine whether a substantial limit is present, relevant factors include the nature and severity of the impairment, the duration of the limitation, and the actual or expected impact of the limitation. *Samuels*, 437 F.3d at 802; *Nuzum v. Ozard Automotive Distrs., Inc.*, 432 F.3d 839, 846-47 (8th Cir. 2005) (citing with approval 29 C.F.R. § 1630.2(j)).

Ladd contends that her alcoholism substantially limits her ability to perform the major life activities of eating, drinking, and socializing. Although none of these activities are expressly recognized as major life activities under the ADA, this Court assumes, for the purposes of this discussion, that they are. *See* 42 U.S.C. § 12102(2) (setting forth a nonexclusive list of major life activities).

For substantial limits on the activity of eating, the most commonly invoked impairment is diabetes. Federal authorities generally agree that ordinary dietary or temporal restrictions are not enough to substantially limit eating. *See, e.g., Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 34-35 (1st Cir. 2010); *Scheerer v. Potter*, 443 F.3d 916, 920 (7th Cir. 2006); *cf. Becerril v. Pima County Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009) (ruling that inability to eat hard foods was not substantially limiting); *Fraser v. Goodale*, 342 F.3d 1032, 1041 (9th Cir. 2003) (finding substantial limits where a diabetic had severe dietary restrictions and was constantly monitoring blood sugar levels).

Though few authorities have considered what constitutes substantial limits upon drinking, eating and drinking are close enough that the case law for eating is also persuasive in the context of drinking. Thus some modest restrictions on the type or timing of drinking will not be enough to substantially limit that activity. *Cf. Vailes v. Prince George's County*, 39 Fed.Appx. 867, 869 (4th Cir. 2002) (ruling that occasional coughing fits did not substantially limit drinking).

While socializing has not been characterized as a major life activity, courts often consider whether impairments substantially limit the ability to interact with others. Where an employee has regular contacts with friends and family, and ordinary contacts with strangers, that person is not substantially limited in the ability to interact with others. *Cooper v. Olin Corp.*, 246 F.3d 1083, 1089 (8th Cir. 2001). For substantial limits to be recognized, a person typically must have severe problems such as high levels of hostility, social withdrawal, or inability to communicate. *Heisler v. Metropolitan Council*, 339 F.3d 622, 628-29 (8th Cir. 2003) (quoting *McAlindin v. County of San Diego*, 192 F.3d 1226, 1235 (9th Cir. 1999)).

Taking all reasonable inferences in her favor, Ladd has not presented evidence that her alleged alcoholism substantially limits her ability to eat, drink, or socialize. Assuming that her alcoholism prevents her from ingesting particular foods or beverages, this limitation is modest in time and severity. Ladd also does not offer evidence that her alcoholism significantly affected the timing or character of her interactions with others. To the contrary, one can socialize without drinking alcohol. There is no proof that Ladd is socially withdrawn or unable to communicate, and so she is not substantially limited in her ability to socialize.

This Court recognizes that, in certain cases, alcoholism can be a disability. But without evidence that her alcoholism substantially limits a major life activity, Ladd cannot rely on this theory to establish her disability here.[2]

### 3.   Regarded as Disabled

Ladd alternately contends that Mohawk regarded her as an alcoholic. The purpose of this theory of disability is to combat "myths or stereotypes" about persons who have or are perceived as having disabilities. *Brietkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 784 (8th Cir. 2006). Where the beliefs of the employer are based on medical evidence, there is no reasonable evidence that the belief is erroneous, and thus an employee cannot proceed on a "regarded as" theory of disability. *Kozisek v. County of Seward*, 539 F.3d 930, 935 (8th Cir. 2008).

Several Eighth Circuit cases have examined, where an employer purportedly regarded its employee to be an alcoholic, whether the employee was disabled under the ADA. The first case in this area, and the one Ladd chiefly relies on here, is *Miners v. Cargill Communications, Inc.* 113 F.3d 820 (8th Cir. 1997).

In this case, the employee allegedly missed work due to a hangover, and was observed drinking, including an incident of purported drunk driving. When the employer demanded that she enter treatment, the employee refused and denied that she was an alcoholic. Based on these circumstances, the court summarily found evidence that the employer regarded the employee as

---

[2]      Under the MHRA definition for disability, the impairment must be one that "materially" limits major life activities, rather than the "substantial" limits recognized under the ADA. *See* Minn. Stat. § 363A.03, subd. 12(1). Based on this distinction, some courts have suggested that the MHRA definition covers less severe impairments. *See, e.g., McLain v. Anderson Corp.*, 567 F.3d 956, 967 n. 3 (8th Cir. 2009). This Court thinks it sufficient to note that, to the extent Ladd claims limitations from her alcoholism, they still are not severe enough to constitute a material limit on her ability to eat, drink anything other than alcohol, or socialize. For these reasons, her alcoholism also does not qualify as a disability under the MHRA.

an alcoholic, and accordingly ruled that she was disabled within the meaning of the ADA. 113 F.3d at 821-23.

Soon after this case, however, the U.S. Supreme Court offered substantial new analysis on the "regarded as" theory of disability. In *Sutton v. United Air Lines, Inc.*, the Court outlined two ways to demonstrate this theory. One is by showing a mistake as to the existence of the impairment itself, where the employer erroneously believes that the employee has a substantially limiting impairment. The other is by showing a mistake regarding the severity of an impairment, where the employer correctly understands that the employee has an impairment, but erroneously believes that it substantially limits a major life activity. 527 U.S. 471, 489 (1999).

Under either theory, therefore, the employer must mistakenly believe that the employee is substantially limited in a major life activity. This principle is illustrated by the Eighth Circuit decision in *Dovenmuehler v. St. Cloud Hospital*. In this case, the employee had a history of drug addiction. There was not evidence, however, to show that the employer mistakenly believed this addiction substantially limited one or more major life activities. The court accordingly found insufficient evidence for a "regarded as" theory of disability under the ADA. 509 F.3d 435, 441 (8th Cir. 2007).

In the Eighth Circuit decision in *Kozisek v. County of Seward*, an employee was charged with assault as a result of his conduct during a drunken rampage. His employer demanded that he enter inpatient treatment for his alcoholism. The court upheld summary judgment against a "regarded as" theory of disability. It observed that there was no evidence of any mistaken belief, and to the contrary, there had been a "very serious incident" showing that the employer's belief was correct. 539 F.3d 930, 935 (8th Cir. 2008).

The *Kozisek* court also distinguished *Miners*. It reasoned that *Miners* involved a scenario where the employee denied being an alcoholic, was never arrested for alcohol-related offenses, and did not receive treatment for alcoholism. The employer there had a mistaken belief, but in *Kozisek*, there was no reasonable evidence of mistaken belief. *Id.* at 935-36.

The record shows that, until Mohawk received the background check for Ladd, it had no reason to know that she had problems with alcohol. When Ladd met with Mohawk management on September 7, she disclosed her drunk-driving convictions and her treatment for alcoholism, but she also claimed that she was fully rehabilitated. In these circumstances, Mohawk may have harbored the belief that Ladd was an alcoholic. In light of her admission that she was treated for alcoholism, this belief was not necessarily erroneous. *Cf. Kozisek*, 530 F.3d at 935.

The dispositive concern here, nevertheless, is whether Mohawk believed that Ladd was substantially limited in a major life activity. Even with all reasonable inferences from the record, there is no evidence to suggest that Mohawk mistakenly held such a belief. For this reason, Ladd cannot establish a disability under a "regarded as" theory. *See Dovenmuehler*, 509 F.3d at 441.

Contrary to what Ladd argues, *Miners* does not compel a different outcome. The current litigation is more like *Kozisek*. Once Mohawk learned about Ladd's drunk driving, Ladd did not deny she was an alcoholic, but instead admitted that she received treatment. More importantly, *Miners* did not consider whether the employer had any mistaken belief as to substantial limits on major life activities. This omission cannot be reconciled with the ensuing U.S. Supreme Court precedent in *Sutton*, which requires such proof.[3] For these reasons, *Miners* is not persuasive.

---

[3]     *Sutton* has since been superseded by the ADA Amendments Act of 2008, which provides more liberal rules of construction for determining whether an impairment constitutes a disability under the ADA. But the ADA Amendments Act did not take effect until January 1, 2009, after all events material to the current litigation. *See* Pub. L. No. 110-325, 122 Stat. 3553 (2008). Although the Eighth Circuit has yet to consider the ADA Amendments Act, other circuit courts

### 4.     Disability Per Se

To demonstrate her disability under the ADA, Ladd offers one other argument that cannot be placed into the statutory framework. She argues that alcoholism is a recognized disability under the ADA, essentially suggesting that alcoholism is a disability per se that does not require further proof.

In support of this position, Ladd chiefly relies on the Eighth Circuit decision in *Crewe v. U.S. Office of Personnel Management.* There the court determined, "[T]here can be little doubt that alcoholism is a handicap for the purposes of the [Rehabilitation] Act." 834 F.2d 140, 141-42 (8th Cir. 1987).

Because the Rehabilitation Act is a legislative precursor to the ADA, federal courts often find that cases about the Rehabilitation Act are applicable to the ADA. *See, e.g., Wojewski v. Rapid City Regional Hosp., Inc.*, 450 F.3d 338, 344 (8th Cir. 2006). And some courts have cited *Crewe* for the proposition that alcoholism is a disability under the ADA. *See, e.g., Office of Senate Sergeant at Arms v. Office of Senate Fair Employment Practices*, 95 F.3d 1102, 1105 (Fed. Cir. 1996).

But as the preceding discussion shows, the ADA supplies an express statutory framework for determining whether an employee is disabled. This Court cannot ignore that framework and conclude that alcoholism is a disability in any event.

In a preponderance of contemporary case law under the ADA, courts have not presumed that alcoholism is a disability. If an employee is an alcoholic, that person must establish that the

---

have consistently ruled that it is not retroactive, and therefore, that it does not govern conduct occurring prior to its effective date. *See, e.g., Carmona v. Southwest Airlines Co.*, — F.3d —, 2010 WL 1010592 at *7 (5th Cir. 2010); *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 33 n. 7 (1st Cir. 2010); *Becerril v. Pima County Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009).

impairment substantially limits a major life activity. *See, e.g., Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162, 1167 (1st Cir. 2002); *Regional Economic Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 46 (2d Cir. 2002); *Burch v. Coca-Cola Co.*, 119 F.3d 305, 316 (5th Cir. 1997). *But see Brown v. Luck Stores, Inc.*, 246 F.3d 1182, 1187 (9th Cir. 2001); *Office of Senate Sergeant at Arms*, 95 F.3d at 1105. There is no reason Ladd should not do the same here.

Within the statutory framework, Ladd advanced two theories of disability. She asserted that her alcoholism substantially limited certain major life activities, or in the alternative, that her employer regarded her as disabled. Taking all reasonable inferences in her favor, however, Ladd has not presented evidence that satisfies either theory. Because she has not met her burden on an essential element of her disability discrimination claims, summary judgment is proper for those claims here.

### 5. Failure to Accommodate

Ladd separately claims that Mohawk failed to make reasonable accommodations for her disability. Based on the prior determination that Ladd is not disabled within the meaning of the ADA, this claim fails.

Furthermore, an employee cannot advance a claim for reasonable accommodation unless the employee has requested accommodation from the employer. *Rask v. Fresenius Medical Care North America*, 509 F.3d 466, 470 (8th Cir. 2007). Where no accommodation is requested, and the employee instead tells the employer that he or she is able to perform all job functions, any ensuing claim for reasonable accommodation is without merit. *Lowery v. Hazelwood Sch. Dist.*, 244 F.3d 654, 660 (8th Cir. 2001).

At her September 7 meeting with Mohawk management, Ladd told them that she had no current problems with alcohol abuse. And when Ladd learned on September 11 that she was

being denied employment, she proposed measures to overcome Mohawk's concerns about her drunk-driving history. These measures included a breathalyzer on her car.

Because Ladd claimed no current problems with alcohol abuse, Mohawk had no reason to know that she required accommodation. And to the extent Ladd proposed various measures on September 11, she was addressing concerns regarding her driving record, and she did not suggest that these measures were intended to accommodate her alcoholism. With reasonable inferences from this record, there is insufficient evidence of an express request for accommodation. This provides further reason for summary judgment against the reasonable accommodation claim.

### C.    Sex Discrimination

#### 1.    Introduction

Ladd also brings sex discrimination claims pursuant to the MHRA and Title VII. 42 U.S.C. § 2000e-2(a); Minn. Stat. § 363A.08, subd. 2. These claims are largely governed by the same standards as the disability discrimination claims. *Hervey v. County of Koochiching*, 527 F.3d 711, 719 (8th Cir. 2008). Absent direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies here as well.

In the context of sex discrimination claims, the prima facie case requires evidence that the plaintiff (1) is within a protected class; (2) is qualified for the job; (3) suffered an adverse employment action; and (4) suffered this action under circumstances that permit an inference of unlawful discrimination. Once a prima facie case is shown, the burden shifts to the employer to state a legitimate, nondiscriminatory reason for the adverse action. The burden then shifts back to the employee to show this reason was an unlawful pretext. *McGinnis v. Union Pacific R.R.*, 496 F.3d 868, 873-74 (8th Cir. 2007).

In the context of this claim, the parties dispute whether Ladd has established an inference of unlawful discrimination; whether Mohawk has stated a legitimate, nondiscriminatory reason for its action; and whether this reason is actually an unlawful pretext for sex discrimination.

## 2. Inference of Unlawful Discrimination

To establish an inference of unlawful discrimination, the most common method of proof is evidence that members of one sex received different treatment than similarly situated members of the other sex. To be deemed similarly situated, however, employees of both sexes must have committed workplace infractions of equal severity. *Bogren v. Minnesota*, 236 F.3d 399, 405-06 (8th Cir. 2000).

Ladd contends that Brady Brower, another salesperson, was similarly situated. But even with reasonable inferences in Ladd's favor, there is no indication that Brower committed similar infractions. For instance, Mohawk only had reason to know that Brower committed one drunk-driving offense, whereas Ladd had two. And there is no indication that Brower was on probation or that his driving privileges had been revoked. As a result, Ladd and Brower are not similarly situated, and his treatment does not permit an inference of discrimination against Ladd.

In the alternative, Ladd argues that an inference of discriminatory animus can be shown though statistical evidence. She observes that, of the forty-seven sales representatives employed by Mohawk, only three are women.

If an employee presents statistical evidence that an employer favored members of one sex over the other, with additional evidence to suggest the employer promoted this disparity, there is prima facie evidence to infer that the employer had discriminatory animus. *Equal Employment Opportunity Comm'n v. Dial Corp.*, 469 F.3d 735, 742 (8th Cir. 2006). But it is not enough to only show that a workplace, or a particular job, was predominated by one sex. *Wittenburg v.*

*American Express Financial Advisors, Inc.*, 464 F.3d 831, 841 (8th Cir. 2006) (finding no inference of animus where only proof was that two of twenty-six employees in a certain job were women); *Bogren*, 236 F.3d at 406 (rejecting inference of animus solely because plaintiff was the only black woman employed as a state trooper); *cf. O'Sullivan v. Minnesota*, 191 F.3d 965, 969-70 (8th Cir. 2000) (finding that animus could not be inferred from the fact that no women were on executive committee).

Aside from the disproportionate ratio of men to women, Ladd does not offer further proof that Mohawk was engaged in discriminatory practices. The disproportionate ratio by itself is not enough to establish an inference of discrimination against women, and therefore, Ladd has failed to establish this element of her prima facie case.

### 3.      Legitimate Reason; Pretext

Assuming for the sake of argument that Ladd did establish an inference of discrimination, Mohawk offers several reasons for its decision not to hire Ladd. It advances concerns regarding misrepresentations in the job application; the driving records and the drunk-driving offenses; and the potential for liability from unsafe driving on the job.

Ladd must not only show that these reasons were false, but also that they were a pretext for sex discrimination. *See, e.g., Dixon v. Pulaski County Special Sch. Dist.*, 578 F.3d 862, 868 (8th Cir. 2009). If an employer takes adverse action against an employee for her or his criminal conduct, and there is no contrary indication that the action was motivated by sex discrimination, then summary judgment is proper for failure to show pretext. *See, e.g., Britton v. City of Poplar Bluff*, 244 F.3d 994, 996 (8th Cir. 2001) (theft); *Owens v. Dep't of the Army*, 312 Fed.Appx. 831, 834 (8th Cir. 2009) (per curiam) (firearm and drug offenses).

Ladd contends that, to the extent that she made apparent misrepresentations on the May 28 job application, it was attributable to an honest misunderstanding on her part. As a result, Ladd argues that Mohawk did not have reason to take adverse action against her. But this argument is misdirected. The inquiry is whether Mohawk intentionally misinterpreted the information Ladd provided in the application, and that it did so as a pretext to engage in sex discrimination against her. Assuming that Mohawk mischaracterized its own application, there is simply no evidence reasonably suggesting that it was a pretext for sex discrimination.

Mohawk also based its decision, in part, on the drunk-driving offenses and concern about whether Ladd was a safe driver.[4] The criminal records, and the potential for future liability, are legitimate, nondiscriminatory reasons for an adverse employment action. *Cf. Britton*, 244 F.3d at 996. And Ladd has not presented any countervailing evidence to show that Mohawk raised these concerns to shut women out.

In the context of her prima facie case, Ladd has not presented evidence would establish the inference that Mohawk discriminated against women. Assuming for the sake of argument that this inference was established, Mohawk supplied a legitimate, nondiscriminatory rationale for its actions, and Ladd has not offered any evidence to suggest this was pretext. Even with

---

[4] Ladd suggests that, when Mohawk documented its qualifications for the sales position, it did not expressly require a clean driving record. She accordingly argues that, when Mohawk raised concerns about her driving record, they were an illegitimate basis for sex discrimination. This argument potentially implicates the second element of the prima facie case, whether the employee is qualified to perform essential functions of the job. *Dixon v. Pulaski County Special Sch. Dist.*, 578 F.3d 862, 868-69 (8th Cir. 2009).

This Court is not persuaded that, when determining what legitimate job qualifications are, the employer should be limited to those qualifications expressly stated in the job description. *Cf. Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1046-47 (8th Cir. 2005) (observing that threshold objective qualifications include physical abilities, education, experience, and general skills necessary for the position). Even where a clean record is not an express requirement for a job, the Eighth Circuit recognizes that past misconduct may otherwise provide objective reasons for an adverse employment action. *See, e.g., Britton v. City of Poplar Bluff*, 244 F.3d 994, 997 (8th Cir. 2001).

reasonable inferences taken in her favor, Ladd has not satisfied essential elements of her sex discrimination claims, and so summary judgment is appropriate for these claims as well.

**D.     Defamation**

In support of her defamation claim, Ladd alleges that various officials at Mohawk made negative comments to her.  So when she applied for employment elsewhere, Ladd contends, she was compelled to report the comments to prospective employers.  Mohawk argues that, because Ladd did not accurately relate the content of its statements, it cannot be liable for defamation.

Defamation ordinarily requires that the defendant publish a false statement regarding the plaintiff to a third party.  So where the defendant makes a statement directly to the plaintiff, there is no claim for defamation.  There is, however, an exception to this rule.  If a defendant makes a defamatory statement to the plaintiff, knowing that the plaintiff will later be compelled to publish the statement to third parties, then the defendant is held liable for defamation.  *Lewis v. Equitable Life Assur. Soc'y*, 389 N.W.2d 876, 888 (Minn. 1986).

For this doctrine to apply, the plaintiff must present some evidence that she or he related the defendant's statements to a third party.  *See Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1011 (8th Cir. 2005) (affirming summary judgment, notwithstanding claims of self-publication, where the plaintiff did not identify when or where the defendant first made the defamatory statements); *Rouse v. Dunkley & Bennett, P.A.*, 520 N.W.2d 406, 407-08, 411 (Minn. 1994) (concluding that, where plaintiff did not accurately report to subsequent employers that defendant terminated him for timecard fraud, the defendant was not liable for defamation).

Ladd allegedly told prospective employers that Mohawk fired her for her alcoholism, or in the alternative, that her position was eliminated.  But according to Mohawk, it refused to hire Ladd because of the misrepresentations in her job application, as well as concerns raised by her

drunk-driving record.  Aside from her characterization of what Mohawk said, there is no other evidence reasonably showing that Ladd accurately reported Mohawk's statements.  Even taking all reasonable inferences in Ladd's favor, this is not enough evidence to establish her theory of self-publication, and so summary judgment is appropriate for the defamation claim here.

**E.  Breach of Contract**

Ladd also advances a claim for breach of contract.  She contends that Mohawk promised her employment for a term of two years, and because they entered into a term contract, she could only be terminated for cause.  Mohawk counters that there was no term contract here, and instead that the parties had an ordinary at-will employment contract, which permits termination without cause.

**1.  Statute of Frauds**

Ladd contends that, through her discussions with Dawald and Johnson, she was verbally promised employment for a two-year term.  Assuming for the sake of argument there is evidence to support this position, Mohawk counters that the agreement is unenforceable under the statute of frauds.  It provides in relevant part,

> No action shall be maintained . . . upon any agreement, unless such agreement, or some note or memorandum thereof, expressing the consideration, is in writing, and subscribed by the party charged herewith . . . that by its terms is not to be performed within one year from the making thereof[.]

Minn. Stat. § 513.01(1).

If an agreement cannot be fully completed within one year, the statute of fraud controls and there can be no action for breach.  An employment agreement with a two-year term cannot be fully completed in one year, and without evidence of a writing, enforcement of the agreement is barred by the statute of frauds.  *Worwa v. Solz Enters., Inc.*, 238 N.W.2d 628, 630-31 (Minn.

1976); *Roaderick v. Lull Eng'g Co.*, 208 N.W.2d 761, 763-64 (Minn. 1973). Because there is no evidence that Ladd's alleged two-year contract was reduced to writing, it is unenforceable and it cannot provide an action for breach of contract.

### 2. At-Will Employment

As there was no term employment contract, Mohawk asserts, Ladd was subject to an at-will employment relationship and could be terminated without cause. Mohawk therefore argues that Ladd's termination cannot be a breach of contract.

If a contract provides for at-will employment, the employer can terminate the employee without cause, and so termination will not constitute a breach of contract. *Reiter v. Recall Corp.*, 542 F.Supp.2d 945, 948 (D.Minn. 2008); *Rosenberg v. Heritage Renovations, LLC*, 685 N.W.2d 320, 326 (Minn. 2004). If a contract does not expressly provide for at-will employment, this is nevertheless presumed, and the employee then has the burden to show that the parties intended terminations for cause. *LeNeave v. North American Life Assur. Co.*, 854 F.2d 317, 319 (8th Cir. 1988); *Thompson v. Campbell*, 845 F.Supp. 665, 677 (D.Minn. 1994).

The record here shows that, in both the job application and the August 22 offer letter, the employment was expressly described as at-will. Even if these documents were not deemed to be an operative contract, the employment relationship is still presumed to be at-will.[5] And Ladd has not presented valid evidence to overcome the presumption. As a result, Mohawk could terminate Ladd for any reason without committing a breach, which further supports summary judgment against the claim for breach of contract.

---

[5] As discussed beforehand, Ladd contends that she executed an employment contract with Mohawk for a two-year term. Under this contract, she argues, she could only be terminated for cause. Ladd accordingly claims that, if other documents provide for at-will employment, those documents amount to an improper attempt to modify the term contract. Based on the preceding conclusion that there was no enforceable term contract, there is no need to consider the question of modification.

### 3. Implied Covenant of Good Faith and Fair Dealing

Ladd alternately suggests that, when Mohawk fired her, it violated the implied covenant of good faith and fair dealing. But Minnesota law does not imply this covenant into employment contracts. *See, e.g., Brozo v. Oracle Corp.*, 324 F.3d 661, 668 (8th Cir. 2003); *Hunt v. IBM Mid America Employees Fed. Credit Union*, 384 N.W.2d 853, 858-59 (Minn. 1986). This argument is without merit.

### F. Promissory Estoppel

The only other claim is for promissory estoppel. It requires a plaintiff to establish that (1) the defendant made a clear and definite promise; (2) the defendant intended to induce, and did induce, reliance on that promise; and (3) the promise must be enforced to prevent injustice. *See, e.g., Housing & Redevel. Auth. v. Norman*, 696 N.W.2d 329, 336 (Minn. 2005). Ladd contends that, at the point that Dawald said "welcome to the family," Mohawk had promised to hire Ladd. Mohawk does not dispute the elements of promise or reliance, but it instead argues, as a matter of law, that enforcement is not justified.

To decide whether enforcement is justified, courts consider several factors, including the formality with which the promise was made; whether the plaintiff's reliance was reasonable; and whether public policy favors enforcement of the bargain or the prevention of unjust enrichment. *Faimon v. Winona State Univ.*, 540 N.W.2d 879, 883 & n. 2 (Minn. App. 1995) (favorably citing Restatement (Second) of Contracts § 90.1 cmt. b (1981)).

Where an employer made certain promises to an employee about continuing employment, but there was no formally executed contract or unconditional promise of renewal, enforcement of a continuing employment contract was not justified. *Faimon*, 540 N.W.2d at 883-84 ("[T]his is not the kind of commitment calling for special judicial action in the name of avoiding injustice.").

The same outcome occurred where a state official allegedly promised a contract, but that official lacked authority to do so and the parties otherwise did not execute a formal contract. *Javinsky v. Commissioner of Admin.*, 725 N.W.2d 393, 399 (Minn. App. 2007).

When Dawald said "welcome to the family," he arguably promised Ladd a position at Mohawk. But there are reasons to question whether Ladd could reasonably rely on that promise. Ladd did not execute a formal contract. And the ensuing August 22 letter—which was the first formal documentation of the offer—placed conditions on employment, including the successful completion of a background check.

Assuming that the initial promise and the August 22 documents are inconsistent with one another, Ladd had reason to place less reliance on the initial promise. And when Ladd learned her employment might be contingent upon a successful background check, she could anticipate her drunk-driving offenses might be a concern. So her continued reliance on the promise became less reasonable.

Public policy also militates against enforcement of the bargain here. The parties do not contest that Ladd had a record of drunk driving, or that the sales position would require frequent driving. For its part, Mohawk was taking reasonable measures to prevent injury and shield itself from liability, and these concerns are well supported by public policy. This Court does not think it prudent to defeat these concerns by enforcing the promise.

When all relevant circumstances are considered, there is not adequate reason, as a matter of law, to enforce the promise. It was never formalized; subsequent circumstances called it into doubt; and enforcement contradicts sound public policy. This Court concludes that enforcement of the promise is not necessary to prevent injustice, and therefore, summary judgment is also properly granted against the promissory estoppel claim.

Opposing this result, Ladd relies on *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114 (Minn. 1981), from the Minnesota Supreme Court; and *Gorham v. Benson Optical*, 539 N.W.2d 798 (Minn. App. 1995), from the Minnesota Court of Appeals. Both cases involved an employee who received a firm offer of employment. The employers later developed reservations about the offers and refused employment. *Grouse*, 306 N.W.2d at 115-16; *Gorham*, 539 N.W.2d at 799-800.

Both courts applied promissory estoppel. *Grouse*, 306 N.W.2d at 115-16; *Gorham*, 539 N.W.2d at 800-01. The *Grouse* court, in particular, opined that because the employee reasonably relied on the employer's promise, he could assume that he would have a "good faith opportunity" to do the job. *Grouse*, 306 N.W.2d at 116.

These cases are distinguishable in several ways. Ladd had reason to place less reliance on the promise. When Mohawk decided to refuse employment, this decision was not because of reservations about Ladd's abilities, but more serious concerns regarding her past criminal record. Because of this record, Ladd could anticipate additional scrutiny, and she could not necessarily assume that she would receive a "good faith opportunity" to do the job. As a result, *Grouse* and *Gorham* do not preclude summary judgment against the promissory estoppel claim here.

### III.  CONCLUSION

Ladd contends that Mohawk engaged in disability discrimination, based on her purported alcoholism. As there is no evidence that alcoholism substantially limited Ladd in any major life activities, or that Mohawk regarded her as having such limits, she does not meet the statutory requirements for disability and that claim fails.

For her sex discrimination claims, Ladd must present evidence to support an inference of unlawful discrimination, but she has not done so. And Mohawk has established, from alleged

misrepresentations in the job application and Ladd's prior history of alcohol-related misconduct, that it had legitimate, nondiscriminatory reasons for its adverse employment actions. Ladd has not offered evidence of pretext to overcome this showing, and as a result, the sex discrimination claim also fails.

Ladd bases her defamation claim on a theory of self-publication. As there is no evidence that she accurately related Mohawk's statements to third parties, this claim is lacking.

To establish her claims for breach of contract and promissory estoppel, Ladd contends that Mohawk purportedly promised her employment for a two-year term. As this agreement was not executed in writing, the action for breach is barred by the statute of frauds. Even if there was an employment agreement, Mohawk could terminate Ladd without cause. Assuming that Ladd was promised employment, enforcement of the promise is not necessary to prevent injustice, and so there is also no basis for promissory estoppel.

Even when all reasonable inferences are taken from the record, Ladd has not presented evidence to create an issue of material fact on these claims, and Mohawk has established that it is entitled to judgment as a matter of law. This Court, therefore, concludes that Mohawk's motion should be granted in its entirety.

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1. Mohawk's motion for summary judgment (Doc. No. 22) be **GRANTED.**

2. The first four counts of the operative complaint, the amended complaint of March 20, 2009, be **DISMISSED WITH PREJUDICE.**

Dated this 1st day of April, 2010.

s/ *Jeanne J. Graham*
JEANNE J. GRAHAM
United States Magistrate Judge

# NOTICE

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **April 15, 2010**. A party may respond to the objections within ten days after service thereof. Any objections or responses filed under this rule shall not exceed 3,500 words. The district court judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit. Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve objections made to this report and recommendation, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.

# APPENDIX

Exh. 1          Depo. of M. Ladd, Aug. 19, 2009 (Decl. of H. Friedenson, Jan. 27, 2010, Exh. 1) [Doc. No. 56].

Exh. 2          Decl. of T. Dawald, Nov. 30, 2009 [Doc. No. 26].

Exh. 3          Application of May 28, 2007 (Decl. of H. Friedenson, Jan. 7, 2010, Exh. 7) [Doc. No. 47].

Exh. 4          Letter of A. Carden, Aug. 20, 2007 (Decl. of H. Friedenson, Jan. 7, 2010, Exh. 10) [Doc. No. 47].

Exh. 5          Decl. of J. Drew, Nov. 30, 2009 [Doc. No. 27].

Exh. 6          Report of Sept. 5, 2007 (Decl. of T. Newton, Nov. 20, 2009, Exh. A (Depo. of M. Ladd, Aug. 19, 2009, Exh. 7)) [Doc. No. 25].

Exh. 7          Job Description [undated] (Decl. of H. Friedenson, Jan. 7, 2010, Exh. 7) [Doc. No. 47].

Exh. 8          Depo. of D. Westerfield, Aug. 21, 2009 (Decl. of T. Newton, Nov. 20 2009, Exh. D) [Doc. No. 25].

Exh. 9          Decl. of D. Westerfield, Nov. 30, 2009 [Doc. No. 28].

Exh. 10         Decl. of M. Ladd, Jan. 7, 2010 [Doc. No. 46].